**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DANIEL J. GREENE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**D'AMBRA CONSTRUCTION COMPANY, INC.,**<br><br>**Defendant.** | **Civil Action No. 25-13188-BEM** |

**MEMORANDUM AND ORDER ON**
**PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**MURPHY, J.**

Plaintiff Daniel J. Greene, Executive Director of the New England Teamsters Pension Fund (the "Pension Fund" or the "Fund"), brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), to compel Defendant D'Ambra Construction Company, Inc. ("D'Ambra") to produce certain records requested for a payroll audit. Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, the Court will grant Greene's motion for summary judgment and deny D'Ambra's motion for summary judgment.

## I. Background

### A. Factual Background

Greene, the Executive Director of the Pension Fund, is a "fiduciary" within the meaning of ERISA § 502(a)(3). Dkt. 36 (D'Ambra's response to Greene's statement of material facts, or

"RSMF") ¶ 1 (citing 29 U.S.C. § 1132(a)(3)).[1] The Pension Fund is an "employee benefit plan" for the purposes of ERISA § 3(3), and a "multi-employer plan" for the purposes of ERISA § 3(37)(A). *Id.* ¶ 2 (citing 29 U.S.C. § 1002(3), (37)(A)). D'Ambra is an "employer" within the meaning of ERISA § 3(5). *Id.* ¶ 3 (citing 29 U.S.C. § 1002(5)). D'Ambra makes contributions to the Pension Fund pursuant to its collective bargaining agreement (the "CBA") with Teamsters Local Union No. 251 (the "Union"), and the Pension Fund's Trust Agreement (the "Trust Agreement"). *Id.* ¶ 4.

Article XXII(d) of the CBA states, in part, that "the Trustees shall have the authority to have an audit of the Payroll and wage records of the Employer for all employees performing work within the scope of and/or covered by this [CBA] for the purpose of determining the accuracy of contributions to the Pension Fund." *Id.* ¶ 6; *see also* Dkt. 27-1 ("CBA") at 21. And the Trust Agreement states that "[t]he Trustees may at any time have an audit made of the general books and ledgers, payroll and wage records or any record that may be deemed reasonably necessary by the Fund or the Fund's auditors of any Employer in connection with the said Contributions and/or reports." RSMF ¶ 7; *see also* Dkt. 27-4 ("Trust") at 9.

The Board of Trustees of the Pension Fund appointed Novak Francella LLC (the "Auditors") to audit D'Ambra's records. RSMF ¶ 8. In a letter dated July 9, 2024, the Auditors notified D'Ambra that they would be conducting an audit for the period from January 2020 through December 2023. *Id.* ¶ 9. D'Ambra provided the Auditors with payroll and wage records for its employees. *Id.* ¶ 10. On March 28, 2025, the Auditors requested via email information about

[1] Because the Court first considers Greene's motion for summary judgment, *see infra* Section III.A, and resolves that motion in Greene's favor, the Court need not consider D'Ambra's own motion for summary judgment. Accordingly, unless otherwise noted, the Court provides the facts as admitted or substantially agreed upon by the parties in D'Ambra's response to Greene's statement of material facts.

fourteen trucking and hauling companies (the "Subcontractors") from D'Ambra's Office Manager, including "copies of some example invoices for these entities."[2] *Id.* ¶¶ 11–12. On April 7, 2025, D'Ambra's Office Manager responded: "I have forwarded your e-mail to our President, I only handle payroll so I can't help you." *Id.* ¶ 20.

The matter was referred to legal counsel for the Pension Fund on April 22, 2025. *Id.* ¶ 21. Counsel for the Pension Fund sent D'Ambra a letter dated May 12, 2025, requesting information on the fourteen Subcontractors. *Id.* ¶ 22. On May 29, 2025, the President of D'Ambra sent counsel for the Pension Fund a letter, stating, "[i]n response to your letter date[d] May 12, 2025, the subcontracted trucking companies listed are all owner-operated and perform hauling services for our company."[3] *Id.* ¶ 23 (quoting Dkt. 1-4). On June 20, 2025, counsel for the Pension Fund sent a letter citing Article XIV(b) of the CBA and asserting that D'Ambra was required to provide the information requested to the Auditors. *Id.* ¶ 27; *see also* Dkt. 1-5. D'Ambra refused to provide the Auditors with its records regarding the Subcontractors. RSMF ¶ 28.

### B. Procedural History

On October 29, 2025, Greene filed the ERISA complaint on behalf of the Pension Fund, seeking a judgment ordering D'Ambra to "produce all documents relevant to" the fourteen Subcontractors, and to pay Greene's attorney's fees and costs. Dkt. 1 ("Complaint" or "Compl.") at 4. On March 27, 2026, D'Ambra filed a motion for a protective order or, in the alternative, to

---

[2] The parties dispute how to characterize the fourteen entities. D'Ambra characterizes them as independent owner-operators, while Greene characterizes them as "Subcontractor Entities." RSMF ¶ 11. However, at the hearing, both parties conceded that the fourteen companies performed subcontracting work, and therefore, the Court will refer to them as the Subcontractors for the sake of brevity.

[3] In its interrogatory responses, D'Ambra characterized an "owner-operator" as "an independent person or entity that owns or leases its own trucking or hauling equipment, operates or controls the operation of that equipment in providing hauling or trucking services, bears its own operating costs, and functions as an independent business rather than an employee of [D'Ambra]," and stated that "based on personal knowledge," all fourteen Subcontractors are "owner-operators." RSMF ¶¶ 24–25. None of the Subcontractors are signatories to agreements with the Union. *Id.* ¶ 26.

quash twelve third-party subpoenas served on twelve of the fourteen Subcontractors identified in the Complaint. Dkts. 14–15. D'Ambra argued that the categories of documents sought in the subpoenas were the very same at issue in this litigation, and that, "[i]f these subpoenas are enforced, the [Pension Fund] will have obtained the substantive relief it seeks without the Court ever ruling on whether the CBA entitles it to that relief." *See* Dkt. 15 at 1. The Court held a hearing on the motion on March 30, 2026, and granted the motion to quash the twelve subpoenas at issue. Dkt. 19. On July 27, 2026, the parties cross-moved for summary judgment. Dkts. 24–25; Dkts. 28–29. The Court held a hearing on November 10, 2026, and took the motion under advisement.

## II. <u>Legal Standard</u>

Summary judgment will only be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Grogan*, 552 F. Supp. 3d at 145 (quoting *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990)).

The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). However, "[t]he nonmoving party cannot fend off summary judgment unless it makes a competent demonstration that every essential element of its claim or defense is at least trialworthy." *Price v.*

*Gen. Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991) (emphasis omitted). "Where the non-moving party bears the ultimate burden of proof, the non-moving party 'must present definite, competent evidence to rebut the motion.'" *Satanic Temple, Inc. v. City of Bos.*, 684 F. Supp. 3d 21, 30 (D. Mass. 2023) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)), *aff'd*, 111 F.4th 156 (1st Cir. 2024).

The same standard for summary judgment applies where, as here, parties have filed cross-motions for summary judgment. *Sec. & Exch. Comm'n v. Navellier & Assocs., Inc.*, 108 F.4th 19, 34 (1st Cir. 2024). "When there are cross-motions for summary judgment, the court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011).

## III. Discussion

There is no dispute that the CBA and Trust Agreement grant the Auditors the right to audit D'Ambra's payroll records related to D'Ambra's contributions to the Pension Fund.[4] Dkt. 29 at 5–6; Dkt. 35 at 8; RSMF ¶ 5. The question central to both motions is whether the Auditors are entitled to review D'Ambra's records relating to the Subcontractors.[5] The Court turns first to Greene's motion for summary judgment.

[4] Section 515 of ERISA obligates "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of . . . a collectively bargained agreement" to "make such contributions in accordance with the terms and conditions of . . . such agreement." 29 U.S.C. § 1145. "In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan" the unpaid contributions, interest thereon, damages, attorney's fees, and other appropriate legal or equitable relief. *Id.* § 1132(g)(2).

[5] The parties agree that the Fund is seeking only D'Ambra's records, not any records in the Subcontractors' possession, *see* Dkt. 25 at 7; Dkt. 33 at 3–4, so the Court need not consider D'Ambra's argument that the Fund is not entitled to audit the entities' own documents, Dkt. 25 at 8–9.

## A. **Greene's Motion**

### 1. **Deference to the Auditors**

Greene argues that the determination by an auditor that certain records are necessary to complete an audit is entitled to deference. Dkt. 29 at 6–8 (citing *Int'l Union of Operating Eng'rs Loc. 98 Health & Welfare Fund v. S & R Corp.*, 95 F. Supp. 3d 1, 6 (D. Mass. 2015)). Greene contends that here, where D'Ambra asserts that each of the fourteen Subcontractors are "owner-operators" beyond the scope of the Pension Fund's audit authority, D'Ambra seeks to impermissibly define for itself the scope of the audit. *Id.* at 7.

Certainly, "the scope of document disclosure that is necessary to permit a reasonable and proper audit must be determined by reference to standard auditing practices and to the expertise of experienced auditors." *S & R Corp.*, 95 F. Supp. 3d at 6. However, if, as a matter of law, the CBA and Trust Agreement could impose no contribution obligations with respect to the fourteen Subcontractors, then the records requested would necessarily fall outside the scope of the Auditors' audit authority. *See* CBA at 21 ("Trustees shall have the authority to have an audit of the Payroll and wage records of the Employer . . . *for the purpose of determining the accuracy of contributions* to the Pension Fund and adherence to the requirements of this section of the [CBA] regarding coverage and contributions." (emphasis added)).[6] Accordingly, the Court will first determine whether the governing documents may impose contribution obligations for the work of

[6] Greene acknowledges that "[w]hether the Subcontractor Entities qualify as 'owner-operators' . . . is the very issue the audit seeks to resolve." Dkt. 29 at 8. But if the CBA and Trust Agreement impose no contribution obligations on D'Ambra for the work of subcontractors—regardless of whether they are properly classified as "owner-operators"—then there is nothing for the audit to resolve or verify with respect to the fourteen Subcontractors. *See Trs. of Michigan Reg'l Council of Carpenters Emp. Benefits Fund v. Exhibit Works, Inc.*, 868 F. Supp. 2d 592, 605 (E.D. Mich. 2012) ("Plaintiffs simply have no right to audit records of employees as to whom no contributions are or could be required as a matter of law.").

subcontractors before determining whether the Auditors are entitled to review records relating to the Subcontractors.

**2. Fund Contributions for Subcontractors**

Greene argues that "the CBA expressly extends its obligations to subcontracted work," which includes the obligation to make Pension Fund contributions. Dkt. 29 at 8, 10. D'Ambra counters that the CBA does not obligate D'Ambra to make such contributions, and that, even if it did, the Labor Management Relations Act ("LMRA") proscribes contributions made on behalf of subcontractors. *See* Dkt. 35 at 5–7, 9–11.

**a. CBA**

"[C]ollective-bargaining agreements must be interpreted according to ordinary principles of contract law." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 135 (2018) (internal quotation marks omitted); *see also M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) ("We interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."). "A court interpreting a contract must first assess whether the contract is ambiguous." *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 783 (1st Cir. 2011). In so doing, "the court must first examine the language of the contract by itself." *Id.* (quoting *Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 648 (2008)).

Article XXII of the CBA, entitled "Pension Fund," states:

> [F]or each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, up to a maximum of 2080 hours for each calendar year, the Employer shall make a contribution of twenty dollars and nineteen cents ($20.19) per hour for all hours to the [Pension Fund].

CBA at 20.[7] The Trust Agreement defines "employee" as "any person covered by a Collective Bargaining Agreement between an Employer and a Union, or pursuant to an agreement between the Fund and an Employer, with respect to whose employment the Employer is required to make Contributions." Trust at 4. Article XIV(b) of the CBA, which governs subcontracting, states:

> The Employer agrees that the wages, hours and working conditions provided for by this Agreement shall encompass the entire work covered by this agreement, thereby applying equally to any subcontracting let by the Employer on work covered by this Agreement. If any Employer shall subcontract work as herein defined, all employees of said subcontractor shall be paid directly by the Prime Contractor, except when such subcontractor is signatory to an agreement with the Local Union or when it is mutually agreed between the Employer and the Local Union or any locals thereof, that the subcontractor may establish his own payroll. Employees of a subcontractor whether or not paid directly by a prime contractor shall not acquire seniority with the prime contractor.

CBA at 13.

Greene argues that, because "the wages, hours and working conditions provided for by [the CBA] . . . apply[] equally to any subcontracting," *id.*, the CBA "expressly provides that subcontracted trucking and hauling remains subject to the bargained-for conditions in the CBA," Dkt. 29 at 9. Greene further emphasizes that Article XIV(b) requires D'Ambra to pay employees of subcontractors directly, *id.*, and that D'Ambra must make Pension Fund contributions "for each and every employee performing work within the scope of and/or covered by this [CBA], whether such employee is regular, probationary, temporary or casual employee," *id.* at 10 (quoting CBA at 18). Taken together, Greene argues, these provisions illustrate that D'Ambra must make contributions not only for its own direct employees, but rather for *any* employee performing work covered by the CBA. *Id.* at 10.

---

[7] The audit period is covered by two trust instruments. *See* Trust; Dkt. 27-5. However, both parties agree that the agreements are "materially identical for present purposes." Dkt. 25 at 8 n.3; *see* Dkt. 38 ¶ 18 ("The Predecessor Trust's audit provision authorizes the Trustees, 'at any time,' to audit 'the payroll and wage records of any Employer in connection with the said contributions and/or reports,' to the same effect as the Trust's audit provision.").

D'Ambra counters that Article XIV(b) merely directs who pays the wages of subcontractors' employees, but does not "convert another company's workforce into D'Ambra's common-law employees." Dkt. 35 at 10. D'Ambra emphasizes that Article XIV(b) dictates that employees of a subcontractor—even those employees paid directly by D'Ambra—"shall not acquire seniority" with D'Ambra, and makes no reference to the Pension Fund or contributions. *See id.* (quoting CBA at 13).

Neither party's interpretation is without its problems. D'Ambra's argument that Article XIV does not convert subcontractors into common-law employees is not dispositive, because an employer may nevertheless be required to make pension fund contributions based on their labor. *See infra* Section III.A.2.b. And many provisions in the CBA bear out precisely this distinction between common-law employees and other workers to whom only certain provisions apply. For example, as D'Ambra notes, Article XIV states that subcontractors' employees "shall not acquire seniority," even those paid directly by an employer party to the CBA. CBA at 13; *see also* Dkt. 35 at 10–11. And seniority eligibility is used to differentiate provisions in the CBA that make little sense as applied to subcontractors' employees, like those addressing hiring and vacation. *See, e.g.*, CBA at 11 (entitling "[a] seniority list employee who has been on the payroll for one or more years, but less than five (5) years . . . to one week's vacation with pay"); *id.* at 10 ("All new employees shall be hired on a sixty (60) days trial basis . . . . After working sixty (60) days in a calendar year, they shall be placed on the Seniority List as a regular employee in accordance with their date of hire."). Indeed, with respect to "Health Services and Insurance Plan" contributions, the CBA expressly mandates that "[t]he Employer shall continue to make contributions *on any seniority list employee* who has worked one hundred (100) days in the calendar year and is laid-off

in the winter season." *Id.* at 19 (emphasis added). There is no such language in Article XXII concerning contributions to the Pension Fund.

Similarly, other CBA provisions expressly apply only to "regular" employees. *See, e.g.*, *id.* at 8 (entitling "[a]ny regular employee on the Seniority list" to paid holidays); *id.* at 15 (mandating eight hours pay "[w]hen a regular employee is injured on the job"). Taken together, these provisions suggest that when the CBA intends to refer to common-law employees, it does so by reference to the seniority list or through use of language like "regular employee." Under this interpretation, provisions that refer simply to "employees"—like Article XXII, the Pension Fund provision—would apply to all employees, including employees of subcontractors.

However, some provisions chafe under this interpretation. For example, Article XXII contemplates Pension Fund contributions of forty hours per week for employees absent due to illness or off-the-job injuries, which maps awkwardly onto employees of subcontractors. *See id.* at 20. And CBA provisions setting forth the grievance mechanism refer only to "employees," but are likewise an ill fit as applied to subcontractors' employees. *See id.* at 12 ("Any discharged employee may file a grievance no later than six (6) working days after discharge by a written notice submitted to the project manager or superintendent and the Local Union."); *id.* at 16 ("The aggrieved employee's or employees' shop steward or another authorized representative of the Union shall first submit a written grievance to the job superintendent, or his duly authorized representative.").

As a result, neither party's interpretation is unambiguously correct. *See Sampel v. Whole Foods Mkt. Grp., Inc.*, 2020 WL 5077493, at *7 (D. Mass. Aug. 27, 2020) ("A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation." (internal quotation marks omitted)). Because the CBA is ambiguous, the Court

cannot say that the CBA definitively does *not* impose Pension Fund contribution obligations on employers like D'Ambra for the work of subcontractors' employees.

**b. LMRA § 302**

D'Ambra argues, however, that even if the CBA itself *did* contemplate Pension Fund contributions for subcontractors' employees, that would violate the LMRA such that no contributions could actually be owed. Section 302 of the LMRA prohibits payments by an employer to "any representative of his employees," 29 U.S.C. § 186(a)(1), except those made to trust funds "for the sole and exclusive benefit of the employees of such employer," *id.* § 186(c)(5). "If the owner-operators fall into the 'independent contractors' category, certain fringe benefit payments on their behalf would violate the LMRA, 29 U.S.C. § 186, which prohibits such payments to labor unions unless the payments are made to trust funds 'for the sole and exclusive benefit of the employees of such employer.'" *Lab. Rels. Div. of Const. Indus. of Mass., Inc. v. Teamsters Loc. 379*, 156 F.3d 13, 15 (1st Cir. 1998) (quoting 29 U.S.C. § 186(c)(5)). In determining whether owner-operators are employees or independent contractors under the LMRA, "the fundamental inquiry is whether the employer has the 'right to control the manner and means by which the product is accomplished.'" *Id.* at 19 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992)); *see also Lab. Rels. Div. of Const. Indus. of Mass., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. No. 379*, 29 F.3d 742, 748 (1st Cir. 1994) ("Distinguishing between employees and independent contractors for purposes of the LMRA is governed by general principles of agency law.").

However, in *Walsh v. Schlecht*, 429 U.S. 401, 407 (1977), the Supreme Court held that the LMRA did *not* prohibit contributions made based on the hours worked by a subcontractor's employees, even if those individuals were not benefits-eligible "employees" under the

common-law test articulated in *Darden*, provided that the contributions were not made "on behalf of" or "for the benefit of" the subcontractor's employees. As summarized by the Seventh Circuit:

> The Court observed that if the clause was interpreted to bind the employer to make contributions to the trust fund "*on behalf of*" or "*for the benefit of*" the subcontractor's employees, so that they could participate in the benefits provided by the funds, it would violate § 302(a)(1) because the subcontractor was not a signatory to the collective bargaining agreement, and his employees were therefore ineligible for trust fund benefits based on work performed for him. If, on the other hand, the clause was interpreted merely as obligating the employer to pay contributions to the funds *measured by* the hours worked by the subcontractor's employees, the benefits being payable only to the employees of the employer and other signatory contractors, it would be authorized under § 302.

*Ill. Conf. of Teamsters & Emps. Welfare Fund v. Mrowicki*, 44 F.3d 451, 461 (7th Cir. 1994) (emphases in original) (citing *Walsh*, 429 U.S. at 407, 410–11); *see also Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 962 (7th Cir. 2001) ("[T]he Supreme Court held that the LMRA permits employer trust fund contributions, regardless of the employment status of the employer's workers, when the amounts of such contributions are measured by the number of hours worked by that employer's workers as opposed to being given simply 'on behalf of' or 'for the benefit of' the employer's workers."). In light of the *Walsh* exception for contributions based on hourly work, the Court "will first examine the manner in which the CBA requires [D'Ambra] to contribute to the Fund[] to determine if such contributions are permissible regardless of the employment status of [D'Ambra's] owner-drivers." *Mazzei*, 246 F.3d at 962.

The CBA mandates that "for each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due, up to a maximum of 2080 hours for each calendar year, the Employer shall make a contribution of twenty dollars and nineteen cents ($20.19) per hour for all hours to the [Fund]." CBA at 20. This is precisely the kind of hourly contribution structure contemplated by *Walsh*. *See Walsh*, 429 U.S. at 407; *Mrowicki*, 44 F.3d at 461 (holding that a provision requiring contributions "for each hour worked by each

employee covered by this Agreement" did not violate the LMRA even if the individuals "were not employees of the company under the common law definition, and . . . would be ineligible to receive benefits from the Fund"); *cf. Mazzei*, 246 F.3d at 962 ("RNA's contributions are to be made 'for each employee' when that employee works at least two days of a work week. The measure of these contributions has no relation to the number of hours these individuals actually work . . . . Therefore, this type of contribution is not like the employer contributions the Supreme Court found to be permissible under the LMRA in *Walsh*."). Accordingly, even if the Subcontractors' employees are not D'Ambra's employees for the purposes of the LMRA, Pension Fund contributions based on their hourly work under the CBA would not violate the LMRA.

**3. <u>Records Requested</u>**

Because the Court has concluded that the CBA might impose pension contributions for the work of the Subcontractors' employees—and that such contributions would not violate the LMRA—the Court concludes that requested records fall within the scope of the Auditors' audit authority.

The Court is not asked, in this action, to determine whether contributions are owed for the work of the Subcontractors, and it need not do so to resolve the question before it—whether the audit authority granted by the CBA and Trust Agreement extends to the requested records. The purpose of the audit is to "determine[e] the accuracy of contributions to the Pension Fund," CBA at 21, and "[t]he Trustees may at any time have an audit made of . . . any record that may be deemed reasonably necessary by the Fund or the Fund's auditors," Trust at 9. Having concluded that the CBA *may* impose contribution obligations for the work of subcontractors' employees, the Court defers to the Auditors' determination that the records requested are "reasonably necessary" to the audit. *See S & R Corp.*, 95 F. Supp. 3d at 6 ("[T]he scope of document disclosure that is necessary to permit a reasonable and proper audit must be determined by reference to standard auditing

practices and to the expertise of experienced auditors."); *cf. Exhibit Works*, 868 F. Supp. 2d at 605 ("Plaintiffs simply have no right to audit records of employees as to whom no contributions are or could be required as a matter of law."). Accordingly, D'Ambra is ordered to produce the records requested concerning the fourteen Subcontractors.

#### 4. <u>Attorney's Fees</u>

Greene argues that D'Ambra is obligated to pay the attorney's fees and expenses the Pension Fund incurred in enforcing its rights to audit D'Ambra's records pursuant to Section 6 of the Trust Agreement, which states:

> In the event that the Trustees shall incur attorney's fees or other expenses in order to enforce the Trustees' right to audit the records of any Employer, such reasonable and necessary attorney's fees or other expenses shall be the obligation of the Employer regardless of whether the Employer was delinquent in Contributions to the Fund for the period of the audit.

Dkt. 29 at 11 (quoting RSMF ¶ 30). D'Ambra argues that Section 6 is not triggered here, where "the Trustees possess no authority to audit records concerning persons for whom no contribution is or lawfully could be owed," and that, therefore, D'Ambra bears no fee obligation. Dkt. 35 at 13. However, for the reasons set forth above, the Auditors are entitled to audit the records at issue. Accordingly, D'Ambra is ordered to pay reasonable attorney's fees and expenses incurred by the Pension Fund in litigating this action.

### B. <u>D'Ambra's Motion</u>

Having already concluded that Greene is entitled to summary judgment, the Court need not separately address D'Ambra's motion for summary judgment, which addresses the same central question presented in Greene's motion. *See* Dkts. 24–25.

## IV. <u>Conclusion</u>

For the foregoing reasons, Greene's motion for summary judgment is GRANTED, and D'Ambra's motion for summary judgment is DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: November 19, 2026